1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

TRACY N. STURCHIO, f/k/a/
RONALD L. STURCHIO,

    Plaintiff,

    v.

THOMAS J. RIDGE,
SECRETARY, DEPARTMENT
OF HOMELAND SECURITY,

    Defendant.

NO.  CV-03-0025-RHW

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

   A bench trial in the above-captioned case was held in Spokane, Washington, beginning on May 9, 2005, and concluding on May 17, 2005. Plaintiff was represented by Larry Kuznetz.  The Government was represented by Frank Wilson.  These findings constitute the Court's final findings of facts and conclusions of law, as required by Federal Rule of Civil Procedure 52(a).

### BACKGROUND FACTS

   In August, 2004, with the help of an understanding family and wife, advanced medical science, supportive friends, and mental health professionals, Plaintiff Ronald Sturchio, at age 56, surgically and psychologically changed his gender from male to female.[1]  Plaintiff is now Tracy Nicole Sturchio, and is

---

[1]The Court has used the female pronouns when referring to Plaintiff's testimony at trial, or when referring to events after October 3, 2002.  In describing Plaintiff's life prior to October 3, 2002, the Court used male pronouns for ease of

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 1**

successfully functioning in the workplace and home as a female.  She claims, however, that in the two years before she announced that she was changing her gender and in the two months thereafter, the United States Border Patrol discriminated against her, in violation of federal law.  To understand the perspective of the Plaintiff and the employees of the Border Patrol, the Court is required to explore the life of the Plaintiff almost from its beginning through the period in question.

**A.    Plaintiff's Background**

Plaintiff was born on May 18, 1948.  Anatomically, he was a male.  As a child, however, Plaintiff felt different—she  testified that "something wasn't right."  He liked to dress up in his mother's clothes.  He wore his mother's make-up when his parents were not at home, and found himself more interested in activities associated with girls than boys.  He started to pray to God to change him from a boy to a girl.  These feelings caused internal conflict within him.  He felt dirty and embarrassed, and perceived that his actions and activities were contrary to his religious upbringing.  In Plaintiff's words, she felt "less than human."  His father was not understanding or kind about his son's differences and, over time, Plaintiff suppressed that side of himself that identified with female activities and traits.  Consequently, Plaintiff kept his feelings secret and did not discuss them with anyone.

During high school, he dated girls and felt comfortable living his life as a male.  At age 17, his girlfriend became pregnant and they married.  He fathered two children during this first marriage.  That marriage ended in divorce in 1972.  He married another woman, but that marriage lasted only about two years.  He married Kim, his current wife, in 1976, and they have three children.

In the late 1980's, Plaintiff once again began to experience his earlier identification with the female gender.  He explains this reawakening as having

reference.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 2**

been caused by an accidental exposure to chemicals containing female hormones. While the explanation is not totally convincing, the need for the explanation is understandable.

Plaintiff described the accident in the following manner: In 1987, he was living in Wyoming with his wife and children. In August of that year, he had some time off and decided to travel alone to visit some friends in California. Out of boredom or a sense of adventure, he decided to take some back roads and got lost. He came across a truck accident, heard a groan, and realized that the driver was pinned in the cab. He called for help but could not reach anyone. He made up his mind to stay with the driver and render assistance until someone came.[2] The truck was carrying an oily substance, which had leaked out of the tank and coated the driver. There was so much of the substance that Plaintiff had to lift the head of the driver to keep him from drowning. In the process of assisting the driver, Plaintiff was covered with the substance as well. Help did not arrive for four hours.

A tow truck, which was camouflaged and had government plates, eventually arrived. The letter "A" was on the plates. Another truck arrived with protective suits. The people in the truck showered Plaintiff and drew his blood. He was told that the substance was going to a cattle yard to be used to put weight on cattle. He later learned that the letter "A" on the plates stood for "Agriculture." After the accident, he went home. He never found out exactly what was in the substance but was told that it contained estrogen and progesterone. Shortly thereafter, he felt nauseated and had flu-like symptoms, but did not seek medical treatment. By November of that year, he noticed that his nipples were leaking, he was starting to put on weight around his hips, and his breasts were enlarging. Again, he did not seek medical advice regarding these symptoms.

Plaintiff testified that the agency involved sent him a 5" by 5" box with tubes and needles. He was instructed to draw blood and return it by mail to the

---

[2]Plaintiff had prior training as an Emergency Medical Technician (EMT).

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** ~ 3

agency in Denver.  He did so on several occasions.  Ultimately, the agency stopped communicating with him.  He was advised by friends that medicines could be taken to reverse the process, but he decided not to take any action to do so.

This explanation of the changes that were happening to Plaintiff is not convincing to the Court, although Plaintiff may have believed such an explanation was probably necessary to explain to others the changes evident in his body.  There are several reasons for this conclusion.  First, there was no medical testimony that Plaintiff's one-time exposure to such chemicals would cause such long-term results.  Second, Plaintiff could not identify where the accident occurred, the names of any of the people involved in the accident, the name of the agency involved, the names of the agents that came to his house, the address of the agency to which he sent the blood samples, nor any other details that normally would be known after such a traumatic event with such startling consequences.  Third, Plaintiff's failure to seek medical treatment or to take actions to reverse the process is not believable, unless Plaintiff was a willing participant in the process.  This conclusion is driven by the testimony that Plaintiff started taking the same chemicals—estrogen and progesterone—under a doctor's care in 1996.  The doctor's notes reflect that Plaintiff told him that he started taking the drugs in 1991.  These same notes reflect that Plaintiff told the doctor that he had been exposed to a fertilizer in the accident, not a feed additive.  Fourth, Plaintiff's wife testified that they used blood draw kits available to them through their employment to send samples to the agency, which was in contradiction to Plaintiff's testimony.  Ultimately, the need to have a story to explain the changes is evident from the testimony of Plaintiff about his earlier childhood.  There had to be substantial conflict going on concerning the reawakened feelings regarding Plaintiff's sexual identity.  Earlier, when identifying as a female, he had felt guilty, dirty, and as if he were not human.  He had felt that he was acting contrary to his religious upbringing.  It appears those conflicts had not been dealt with and were part of

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 4**

Plaintiff's process of exploration in the 1990's and 2000's that ultimately led to the successful transformation surgery in 2004.

These facts lead the Court to conclude that Plaintiff began to be affected by his feelings of conflict with his gender as early as 1987, and he began to take prescription medication to deal with it. As a result, he needed to have a story that explained his situation in a manner that permitted him to live as a man to the outside world while dealing with his own conflicts concerning his gender. This conclusion, however, does not affect the Court's analysis in determining whether the United States Border Patrol created a hostile workplace, or sexually discriminated or retaliated against Plaintiff. Nonetheless, Plaintiff's story affected how management and her coworkers related to her and treated her at the workplace.

**B.    Plaintiff's Employment with the United States Border Patrol**

Plaintiff began working for the United States Border Patrol, now the United States Customs and Border Protection, in 1991. In July 1998, Plaintiff transferred to the Spokane sector of the United State Border Patrol and began working as a Supervisory Telecommunications Specialist. At that time, Plaintiff was known as Ron Sturchio, and was participating in society as a male.

Management considered Plaintiff to be an excellent electronics technician. Shortly after Plaintiff began working at the Spokane sector, however, his coworkers complained to management about Plaintiff discussing the subject of his physical appearance with them. Management considered the discussions with coworkers that were initiated by Plaintiff to be inappropriate, and this conclusion was not unreasonable, given the complaints and their unwelcome nature.[3] As

---

[3]In December 1998, Steven Garrett, Assistant Chief Patrol Agent, met with Plaintiff to discuss the issue of his inappropriate comments to his subordinates, and told him not to discuss his physical appearance unless the person invited the

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 5**

noted, in 1996, Plaintiff had advanced enough in his acceptance of his gender conflict that he sought medical advice in Oakland, California, and began to take estrogen and progesterone by prescription. These drugs cause a male to develop female physical characteristics, including enlarged breasts. While employed at the Spokane sector, Plaintiff had a feminine appearance that included enlarged breasts. Plaintiff's feminine appearance was noticeable, at times, when Plaintiff wore t-shirts or polo shirts, and at other times, was disguised so that her breasts were not noticeable. At work, Plaintiff dressed as a man, wore large shirts, and generally tried to hide her breast development from coworkers. Nevertheless, her coworkers were aware of her enlarged breasts.

As Ron, Plaintiff recounted the story of the accident, unsolicited, to his coworkers numerous times. In doing so, he presented himself to his coworkers as a male who suffered an unfortunate accident and was not happy about the changes that were taking place with his body. In reality, while Ron was explaining to his coworkers that the accident affected his appearance, he also was secretly taking estrogen that is known to cause the same effect.

This conflict between reality—that he was dealing with a gender conflict and was taking estrogen, which causes a male to develop female characteristics—and fiction—that the accident caused the changes with which Plaintiff was unhappy—created difficulties and confusion in his relationship with his coworkers. Testimony revealed that Plaintiff brought up his physical appearance and the accident, unsolicited and in a manner that made the coworker hearing the story uncomfortable. Understandably, the discomfort was caused because the subject was too intimate for the type of relationship between Plaintiff and the coworker, or it was interpreted as inappropriate because of the coworker's belief system. Ron's

comments. Plaintiff does not contend that the meeting or the directive to not discuss his physical appearance was improper, or amounted to sexual harassment or discrimination.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 6**

unsolicited discussion of his breasts and the accident with coworkers who were merely acquaintances of Ron, was easy to misinterpret. From Plaintiff's perspective, talking about his body was a comfortable subject to discuss with his coworkers. From the perceptive of his coworkers, however, it could have been interpreted as an effort by him to become closer to the coworker than was appropriate, given the relationship. Testimony revealed that many of his coworkers were uncomfortable in discussing Plaintiff's appearance with him. In our society, most people relate to others under the assumption that they are who they appear to be, *i.e.,* male or female, and content to be so. Men do not normally talk about their breasts, enlarged or not, with mere acquaintances. Women do not talk about their breasts, enlarged or not, with mere acquaintances. In that context, a male talking about an accident and the development of female characteristics would be unusual, and a feeling of discomfort by the coworker would not be unusual or unexpected. At this point in time, Ron's coworker's knew him only as a male, and had no idea that he had a gender identity disorder. It is understandable that his comments could have been taken as unusual and uncomfortable sexual comments toward his male coworkers. Thus, while the Court does not pass judgment on those who were uncomfortable speaking with Plaintiff regarding her appearance, their discomfort was understandable, given the topic of discussion, the environment in which it was being spoken, and the fact that the coworkers were receiving mixed signals regarding Plaintiff's gender identity.

Shortly after Plaintiff began working at the Spokane sector, he began to have difficulty with two employees. Plaintiff had never acted as a supervisor prior to working at the Spokane sector. At first, he worked in tandem with the former supervisor whom he was hired to replace. Soon after Plaintiff was hired, the sector hired Robert Simer and Hal McCormick as telecommunications technicians. Plaintiff was in charge of their supervision. These employees were difficult to manage. Mr. Simer and Mr. McCormick complained constantly to management

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 7**

concerning Plaintiff's management style.  Plaintiff, in like manner, complained about Mr. Simer's and Mr. McCormick's work ethics and abilities, and the fact that they would circumvent his authority by going to management for supervision.  These conflicts continued throughout his tenure as supervisor of the shop at the Spokane sector.

In August 2002, unbeknownst to her coworkers or management, Plaintiff began to make preparations to start living as a woman.  Plaintiff did not have a doctor directing her gender care at this time, but was aware of a protocol that was usually followed for people who were considering gender reassignment surgery.  The protocol was contained in the Harry Benjamin International Gender Dysphoria Association's Standards of Care for Gender Identity Disorders, Sixth Version, February 2001.  According to these standards, if a person is considering transitioning from male to female, it is recommended that the person undergo a real-life experience in which the person lives outwardly in society as their preferred gender.  Plaintiff legally changed her name in August 2002.  She also had her driver's license and social security records changed to reflect her new name and gender.

On October 3, 2002, without prior notice (except to Debra Lutz),  Plaintiff reported to the Spokane sector dressed as a woman.  Prior to this date, Plaintiff had met with Ms. Lutz and told her that she was planning on changing her name and gender.  On that day, Plaintiff wore make-up and women's clothing and wore her hair down.  She also met with Steven Garrett, Assistant Chief Patrol Agent, who sent out a mass email, which Plaintiff had approved, explaining Plaintiff's name and appearance change.

When Plaintiff made her transition from male to female, she did not provide the United States Border Patrol with any information regarding her gender disorder, or the Harry Benjamin standards.  She did not discuss with them her reasons for transitioning from female to male.  She did not tell them she was

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 8**

following medical protocol.  Management complied with Plaintiff's request to be referred to as Tracy and, as discussed above, informed her coworkers of the change.

### OVERVIEW OF TITLE VII CLAIMS

In *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), the Supreme Court held that discrimination based on sex stereotyping violates Title VII.  *Id.* at 252. Title VII of the Civil Rights Act of 1964 provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Plaintiff alleges that she was subject to a hostile workplace environment, was retaliated against for complaining of the gender discrimination, and was discriminated against on account of her gender, in violation of Title VII.

### A.    Hostile Workplace Environment

"When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  In order to succeed in her hostile work environment claim, Plaintiff must establish that: (1) she was subjected to verbal or physical conduct of a sexual nature; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment.  *Porter v. California Dep't of Corrections*, 383 F.3d 1018, 1027 (9th Cir. 2004).  Plaintiff also must show that any harassment took place "because of sex."  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998).  In order to show that the conduct was ongoing and persistent harassment, Plaintiff needs to prove that her workplace was "both objectively and subjectively offensive, one that a reasonable person

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 9**

1    would find hostile or abusive, and one that the victim in fact did perceive to be so."

2    *Nichols v. Azteca Restaurant Enters., Inc.*, 256 F.3d 864, 871-72 (9th Cir. 2001),

3    *quoting Faragher v. City of Boca Roton*, 524 U.S. 775, 787 (1998).  To determine

4    whether an environment is sufficiently hostile or abusive to violate Title VII, the

5    Court considers the totality of the circumstances, including the "frequency of the

6    discriminatory conduct; its severity; whether it is physically threatening or

7    humiliating, or a mere offensive utterance; and whether it reasonably interferes

8    with an employee's work performance."  *Id.* at 872, *quoting Harris*, 510 U.S. at 23.

9    A hostile environment may result from a single instance of sexual harassment if the

10   harassing conduct is sufficiently severe.  *Id.*

11   **B.    Retaliation**

12   Title VII prohibits employers from discriminating against an employee

13   because that employee "has opposed any practice made an unlawful employment

14   practice by this subchapter, or because he has made a charge, testified, assisted, or

15   participated in any manner in an investigation, proceeding, or hearing under this

16   subchapter." 42 U.S.C. § 2000e-3(a).  To establish a prima facie case of retaliation,

17   an employee must show that (1) she engaged in a protected activity; (2) her

18   employer subjected her to an adverse employment action; and (3) a causal link

19   exists between the protected activity and the adverse action.  *Ray v. Henderson*,

20   217 F.3d 1234, 1240 (9th Cir. 2000).  If Plaintiff meets her burden in asserting a

21   prima facie retaliation claim, the burden shifts to Defendant to articulate a

22   legitimate nondiscriminatory reason for its decision.  *Id.*  If Defendant articulates

23   such a reason, Plaintiff bears the ultimate burden of demonstrating that the reason

24   was merely a pretext for a discriminatory motive.  *Id.*  When adverse employment

25   decisions closely follow complaints of discrimination, retaliatory intent may be

26   inferred.  *Villiarimo v. Aloha Island Air, Inc*., 281 F.3d 1054, 1065 (9th Cir. 2002)

27   (holding that the causal link between a protected activity and the alleged retaliatory

28   action "can be inferred from timing alone" when there is a close proximity between

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 10**

1  the two); *Bell v. Clackamas County*, 341 F.3d 858, 865-66 (9th Cir. 2003) (holding

2  that proximity in time may, by itself, constitute circumstantial evidence of

3  retaliation).  Making an informal complaint to a supervisor, as well as making a

4  formal complaint with the EEOC, are protected activities.  *Ray*, 217 F.3d at 1240

5  n.3.

6  **C.    Sexual Discrimination**

7          In order to prevail in her sexual discrimination claim, Plaintiff must establish

8  a prima facie case of discrimination.  *Vasquez v. County of Los Angeles*, 349 F.3d

9  634, 638 (9th Cir. 2003).  To do so, Plaintiff must offer evidence that gives rise to

10  an inference of unlawful discrimination, either through the framework set forth in

11  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or with direct or

12  circumstantial evidence of discriminatory intent.  *Id.*  Under the *McDonnell*

13  *Douglas* framework, unlawful discrimination is presumed if the plaintiff can show

14  that "(1) she belongs to a protected class, (2) she was performing according to her

15  employer's legitimate expectations, (3) she suffered an adverse employment action,

16  and (4) other employees with qualifications similar to her own were treated more

17  favorably."  *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998),

18  *citing McDonnell Douglas Corp.*, 411 U.S. at 802.  Direct evidence is "evidence

19  which, if believed, proves the fact [of discriminatory animus] without inference or

20  presumption."  Id. at 1221 (alteration in original).

21          If Plaintiff succeeds in doing so, then the burden shifts to Defendant to

22  articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory

23  conduct.  *Vasquez*, 349 F.3d at 638.  If Defendant provides such a reason, the

24  burden shifts back to Plaintiff to show that Defendant's reason is a pretext for

25  discrimination.  *Id.*  In a mixed-motive case, that is, where the employer has

26  offered more than one reason for the action that it took, and at least one of the

27  reasons may be legitimate, the trier of fact must determine first whether the

28  discriminatory reason was "a motivating factor" in the challenged action.  If the

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 11**

1    answer to this question is in the affirmative, then the employer has violated Title
2    VII. *Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061, 1067 (9th Cir. 2003).
3    Plaintiff can show pretext directly, then, by showing that discrimination more
4    likely motivated Defendant, or indirectly, by showing that the Defendant's
5    explanation is unworthy of credence. *Vasquez*, 349 F.3d at 641.

6        In its Motion to Dismiss, the Government argued that Plaintiff, as a
7    transgender person, does not receive protection under Title VII. The Court
8    disagreed because recent case law supported the premise that discrimination based
9    on sexual stereotypes violates Title VII.[4] In this regard, Plaintiff is asserting that
10   prior to October, 2002, he was discriminated against because he had a feminine
11   appearance, and after October, 2002, she was discriminated against because she
12   changed her gender and was now participating in the workplace as a female.

### ANALYSIS

14       The record is replete with complaints, labor grievances, EEOC complaints
15   filed by Plaintiff, bad work evaluations, suspensions, and other actions and
16   inactions by management that would constitute adverse work consequences if
17   motivated by gender. The Court has reviewed at length the actions and inactions
18   alleged to be discriminatory. While the Court may not agree with the specific
19   action or management's failure to act in response to the complaints made by
20   Plaintiff, this is not the test that the Court must apply. To find for Plaintiff, the
21   Court must conclude that the motivations for the actions or inactions were gender-
22   related, retaliatory, or were a pretext for gender discrimination.

23       The following instances were presented at trial:

---

[4]In *Price Waterhouse*, the Supreme Court held that an employer may not force its employees to conform to the sex stereotype associated with their gender as a condition of employment. 490 U.S. at 250-51; *see also Schwenk v. Hartford*, 204 F.3d 1187 (9th Cir. 2000).

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 12**

(1)    January 2000 - Wayne Reome questioned coworkers regarding Plaintiff's appearance and sexual advances.

(2)    May 2000 - Complaint by Plaintiff to management regarding content of the programming that was being played by Mr. Simer. (Ex. 4.) By February 6, 2001, this issue appears to have been resolved by permitting Mr. Simer to play his radio at a low level. (Ex. 31.)

(3)    July 12, 2000 - Unfair Labor Practice complaint filed by Daryl Schermerhorn against Plaintiff. (Ex. 5.) The complaint asserted that Plaintiff repeatedly coerced and intimidated his subordinates in the Spokane sector from becoming members of the union and from consulting with the union concerning work-related issues. This ULP was ultimately withdrawn. (Ex. 28.)

(4)    July 2000 - Complaint filed by Mr. Simer alleging numerous instances of misconduct by Plaintiff. (Ex. 202.) As a result of the memo, management contacted the Office of Internal Audit (OIA), who conducted an internal investigation. On July 21, 2000, Plaintiff was relieved from his supervisory duties as a result of the OIA investigation. (Ex. 11.) As a result of the investigation, management proposed that Plaintiff be suspended from duty without pay for five days for unauthorized possession of government property and noncompliance with standards, policies, regulations, or instructions issued by the Service. (Ex. 18.) Plaintiff filed a reply to the proposal and took responsibility for his conduct. (Ex. 7.) The five-day suspension was reduced to three days, and his supervisory duties were reinstated in October 2000. (Ex. 24.)

(5)    September 13, 2000 - Mr. McCormick handed Plaintiff a business

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 13**

card that had derogatory comments on the back.[5] (Ex. 13.)

(6)  December 2000 - Mr. McCormick alleged that Plaintiff had made remarks to other employees that McCormick has AIDS. (Ex. 26.)

(7)  January 2001 - Plaintiff complained about remarks made by Mr. McCormick regarding access to assault rifles.  (Ex. 233.)

(8)  January 25, 2001- Union filed another UFL complaint against Plaintiff.  (Ex. 30.)  The complaint alleged that Plaintiff had been making false accusations, threats to individuals, and making comments and remarks intended to cause further disruption within the electronics shop.  On March 20, 2001, the complaint was withdrawn. (Ex. 33.)

(9)  September 2001 - Mr. McCormick injured himself on an ATV vehicle.  Plaintiff filed out accident report and was reprimanded for manner in which the report was written. (Exs. 38, 39.)

(10)  February 8, 2002 - Plaintiff wrote memo to Chief Patrol Ortega regarding missing equipment.  (Ex 254.)  In the memo, Plaintiff implied that Mr. Simer may have taken some equipment when he left his employment at the Spokane sector.  Upon investigation, it was revealed that these items were personal protective equipment that were not expected to be returned.  Plaintiff subsequently asked that the memo be disregarded.

(11)  June 11, 2002 - Plaintiff received letter of reprimand for discussing with other employees complaints he had filed. (Ex. 261.)

(12)  September 2002 - Border Patrol Agent Christopher Gomez submitted a memo to Chief Patrol Agent of the Spokane sector stating that when he and Plaintiff were working at an isolated location, Plaintiff

---

[5]The business card stated: "You are cordially invited to go fuck yourself."

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 14**

discussed his physical appearance with Agent Gomez, and Agent Gomez was uncomfortable with the conversation. (Ex. 48.)

(13)  September 30, 2002 - Management issued proposed disciplinary action in which management proposed suspending Plaintiff from duty without pay for fourteen days. (Ex. 51.)  The proposal made three charges: failure to report vehicle accident; lack of candor; and failure to follow direct supervisory instruction.  Plaintiff responded to the proposal, and only the charge for failure to follow a direct supervisor instruction, which involved the Gomez incident, was sustained.  The fourteen-day suspension was reduced to three days.  (Ex. 56.)

Of the numerous items claimed by the Plaintiff to be improper or discriminatory, the Court finds, after weighing the evidence, insufficient evidence to conclude that they were gender-motivated, retaliatory, or constituted a hostile work environment.  It was clear from reviewing the evidence that during the period in question, the workplace environment at the Spokane sector shop was permeated with dissension, mistrust, and acrimony.  This environment, while unpleasant from Plaintiff's standpoint, is not enough to sustain a claim under Title VII, however. *See Oncale*, 523 U.S. at 80 (confirming that Title VII is not "a general civility code for the American workplace").

**A.    Hostile Work Environment**

In order to succeed in establishing her hostile work environment claim, Plaintiff must show that she was subjected to verbal or physical conduct of a sexual nature.  *Porter*, 383 F.3d at 1027.  Of all the instances presented at trial, only two involved verbal or physical conduct of a sexual nature: (1) Questioning by Wayne Reome; and (2) Derogatory Business Card.

**(1)    Questioning by Wayne Reome**

Marvin Foust began supervising the Electronics shop in October 1999, and he related that the shop seemed to be running well until January 2000.  At that

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 15**

time, Plaintiff reported that Wayne Reome, a union steward, asked certain employees of the Spokane sector two specific questions: (1) whether the employee was offended by Plaintiff's appearance of femininity; and (2) whether he made any sexual advances toward them. Mr. Reome denied asking the questions in this form, but admitted asking questions about Plaintiff in his capacity as a union steward or officer. The Court finds that the questions regarding Plaintiff's appearance and whether he made any sexual advances were actually asked. Numerous employees of the Spokane sector testified that Mr. Reome approached them and asked these particular questions. It is alleged that these questions were improper and constituted a hostile work environment, and that management did nothing to prevent the event from reoccurring.

Given the fact that Plaintiff had discussed his breasts and the accident with employees and some employees felt uncomfortable about it, it is not clear that a union official would be acting improperly in inquiring about the subject. Plaintiff's unsolicited discussion of the subject could be considered unwelcome, and the subject of corrective action by management or grievance by the union. Secondly, the questions are not of such a nature that they created a hostile work environment. Even if the questioning was improper, management told Mr. Reome to stop the inquiry which, at the time, was all that was legally required.

On December 20, 2002, Plaintiff notified Mr. Garrett that Mr. Reome was again asking questions regarding Plaintiff's appearance and whether she had made any sexual advances toward her coworkers. Specifically, the memos that were submitted by Pat Dale and Johnny Sievers used the phrase "hit on." Mr. Reome again denied asking other employees if Plaintiff had "hit on" on anyone. The matter was investigated by LeAlan Pinkerton, Assistant Chief Patrol Agent, and he concluded that the claims of misconduct were general, conclusory, and non-specific. He further concluded that even if the alleged statements had been made, it would not constitute harassment because it would not alter the conditions of

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 16**

Plaintiff's employment, nor would it have created an abusive environment.

While Mr. Reome may have not used the exact words of "hit on," there was once again corroborating testimony that he did, in fact, question Plaintiff's coworkers regarding her appearance and whether she made any sexual advances toward them. Nevertheless, the questioning by Mr. Reome does not support a finding that the workplace at the Spokane sector was so permeated with discriminatory intimidation, ridicule, or insult that was sufficiently severe or pervasive to alter the conditions of the victim's employment. Over two years passed between the questioning of Mr. Reome. While the evidence is clear that Plaintiff was subjectively offended by the questioning, such questioning was not objectively offensive.

Like the perception problems experienced by coworkers earlier when Plaintiff talked about her breasts, it is not unusual that some employees would wonder about the significance of a change in dress and name at the workplace. There had been no explanation of the reasons for the change, the length of its duration, the protocol, or the anticipation of surgery. To the uninformed, there was a male body covered by female clothing. In this context, the inquiries by Mr. Reome, while insensitive, do not constitute harassment, and were not so pervasive as to create a hostile work environment. There also is no reason to believe that the reaction would have been any different if the change had been from female to male.

**(2)    Derogatory Business Card**

Mr. McCormick's handing out of a business card printed with a derogatory comment was conduct that was sexual in nature. At trial, Plaintiff testified that Mr. McCormick had shown the card to many of the employees in the shop. Plaintiff did not find it offensive at the time, and it was only after he pondered the message on the card that he felt offended by the card. The distribution of the business card was an isolated incident, and there was no evidence in the record that it ever

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 17**

1  happened again.  While a hostile environment may result from a single instance of
2  sexual harassment if the harassing conduct is sufficiently severe, *Brooks v. City of*
3  *San Mateo*, 229 F.3d 917, 925, 927 (9th Cir. 2000), this isolated incident is not
4  sufficiently sever to establish a hostile work environment.

5          It is apparent to the Court that Plaintiff felt isolated and picked upon by her
6  coworkers and management during the period in question. Given that she was
7  secretly taking hormones to change her appearance from male to female, it is not
8  surprising that she believed that people disapproved of what they saw and,
9  therefore, discriminated against her on that basis.  The Court is confident that
10 Plaintiff's appearance caused some people to reject her and caused her not to be
11 accepted in the same manner as coworkers.  Part of the Plaintiff's sense of
12 discomfort and isolation was caused by her own heightened sensitivity, and part by
13 reality. However, the evidence did not convince the Court that the Plaintiff's
14 appearance motivated conduct that created a hostile work environment because of
15 gender.  There is no evidence in the record that Plaintiff was forcibly subjected to
16 sex-related, humiliating actions*,* physical assault made in a sexual manner, or
17 threats of rape, *see Oncale*, 523 U.S. at 76; that she was subject to grabbing,
18 poking, rubbing, or mouthing areas of the body linked to sexuality, *see Rene v.*
19 *MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1065 (9th Cir. 2002); or that she was the
20 subject to any name calling, taunting, or teasing, *see Nichols*, 256 F.3d at 872.  It
21 does not appear that Plaintiff was ever the subject of simple teasing or offhand
22 comments regarding her appearance.  *See Faragher*, 524 U.S. at 788 (holding that
23 "simple teasing, offhand comments, and isolated incidents (unless extremely
24 serious) will not amount to discriminatory changes in the terms and conditions of
25 employment").

26         Plaintiff has not met her burden of establishing that the workplace at the
27 Spokane sector was permeated with discriminatory intimidation, ridicule, and
28 insult that is sufficiently severe or pervasive to alter the conditions of her

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 18**

employment.  As such, her claim under Title VII that she was subject to a hostile workplace environment fails.

**B.    Retaliation Claims**

Plaintiff asserts that she has been repeatedly retaliated against as a result of her filing EEO complaints.  It appears that Plaintiff first contacted the EEO in September 2000.  Plaintiff received a notice of right to file on January 16, 2001, and he filed a formal complaint on January 24, 2001.  In the formal complaint, Plaintiff alleged he was being harassed regarding his physical appearance.  Plaintiff filed another EEO complaint in February 28, 2003, alleging that she was being retaliated against for filing her first EEO complaint.

In order to succeed in her Title VII retaliation claim, Plaintiff must show that a causal link exists between the protected activity and the adverse action.  *Ray*, 217 F.3d at 1240.  It is undisputed that the Plaintiff engaged in protected activity, and it is undisputed that Plaintiff suffered adverse employment action.  The key issue, then, is whether the adverse employment action was as a result of Plaintiff filing her EEOC complaints.

At the trial, Plaintiff did not specify the particular acts of retaliation that she is asserting.  In her second EEO complaint, however, Plaintiff identified the following instances of retaliation that have not already been addressed by the Court and merit discussion: (1) the extension of the 1999/2000 performance plan and the minimally satisfactory rating for the October 1, 2001- September 30, 2002 performance evaluation; (2) complaint by Mr. McCormick regarding AIDS comment; (3) complaints by coworkers; (4) the change in position from Supervisory Telecommunications Specialist, GS-391,  to Telecommunication Specialists, GS-391; and (5) the October 2002 disciplinary action. (Ex. 333).

**(1)    Performance Appraisals**

The United States Border Patrol evaluates its employees using a multi-phased system.  The Performance Appraisal Record consisted of a Performance

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 19**

Work Plan (PWP), Progress Review Record, Performance Achievements, and Individual Element Ratings. The PWP set forth the job elements. The Progress Review Record was generally completed mid-year[6] and the individual element ratings were issued at the end of the rating period.

Since transferring to the Spokane Sector, and during the relevant time period of this lawsuit, Plaintiff received six performance evaluations spanning discrete rating periods: (1) October 1, 1998-September 30, 1999 (Ex. 80); (2) October 1, 1999-September 30, 2000 (Ex. 81); (3) October 1, 2000-March 31, 2001 (Ex. 82); (4) May 1, 2001-September 30, 2001 (Ex. 83); (5) October 1, 2001-September 30, 2002 (Ex. 84); and (6) October 1, 2002-September 30, 2003 (Ex. 85).

The Performance Work Plan (PWP) sets forth the job elements against which the employee will be evaluated. Mr. Foust testified that at some point after the April 2000 progress review, management determined that the original PWP did not provide job elements to allow it to evaluate Plaintiff's supervisory abilities. According to Mr. Foust, a final review was not conducted in September 2000, because Plaintiff's PWP had been changed to include additional job elements involving supervision. According to an email written by Loretta Lopez-Mossman, Plaintiff was not evaluated in September 2000, because he was relieved of his supervisory duties on July 21, 2000 during the OIA investigation. When Plaintiff was reinstated as a supervisor in October 2000, he was issued a revised PWP at that time. Consequently, he was not given a final PWP for the rating period October 1, 1999 to September 30, 2000. Instead, he was given a final rating on March 21, 2001.

Plaintiff asserts that the failure to provide a final evaluation in October 2000 was retaliatory as a result of his contacting the EEO in September 2000. Case law

---

[6]Mr. Foust testified that management generally tries to conduct two evaluations during the year before the final evaluation.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 20**

has held that proximity in time may, by itself, constitute circumstantial evidence of retaliation.  Assuming that Plaintiff has made a prima facie case of retaliation based on proximity of time alone, Defendant has met its burden of showing legitimate nondiscriminatory reasons for not providing a final evaluation in September 2000 and extending the final evaluation period to March 2001.  The final evaluation was not done in September 2000, because Plaintiff had been under a disciplinary investigation and was relieved of his supervisory duties.  Also, Defendant explained that it was unable to successfully evaluate Plaintiff's supervisory abilities because the PWP did not adequately set forth the job elements that needed to be evaluated.  Once the new PWP was issued, ninety days had to pass before Plaintiff could be evaluated under the new PWP.  Given that Defendant articulated a legitimate nondiscriminatory reason for the decision to extend the evaluation, Plaintiff needed to demonstrate that the reason for extending the evaluation was merely a pretext, and management's motivation for extending the evaluation period was discriminatory.  The evidence does not support a finding of pretext, or discriminatory motive.

Plaintiff asserts that Mr. Foust retaliated against her for filing her EEO complaint by rating her as only minimally satisfactory for the October 30, 2001- September 30, 2002 period, when previously she had been rated either outstanding or fully successful.  Plaintiff had filed her formal EEO complaint in January 2001.  Over one and a half years had passed by the time the evaluation was complete.  Thus, no inference of retaliatory intent can be made. During that time, there had been numerous complaints regarding Plaintiff's supervisory abilities.  Plaintiff has not met her burden of showing a causal link between the protected activity and the low performance evaluation rating.

### (2)    Complaint by Mr. McCormick

In late 2001, Mr. McCormick had injured himself at work, and consequently, there may have been a small amount of  blood that was left on a machine.  Plaintiff

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** ~ 21

made a comment to Mr. Simer regarding the blood on the machine and Mr. McCormick interpreted the comment to mean that Plaintiff was insinuating that Mr. McCormick had AIDS. Mr. McCormick's written complaint is an outgrowth of the acrimony and lack of communication that permeated the Spokane sector shop. According to Plaintiff's testimony, she meant nothing by the comment to Mr. Simer, other than to be concerned about workplace safety. Mr. McCormick interpreted the statement to mean something more. Rather than being retaliatory, the complaint was based on misperceptions and misunderstandings. Moreover, it is not clear that Plaintiff suffered an adverse employment action on account of Mr. McCormick's complaint.

### (3)    Complaints by Coworkers

Plaintiff also asserts that the majority of complaints by her coworkers were in retaliation for her filing her EEO complaints, including union grievances. As discussed above, there was little direct evidence in the record that would suggest that these complaints were motivated by discriminatory intent. Management had to respond to these complaints and they did not do so in a discriminatory manner. Also, management did not have control over the union activities.

### (4)    Change in Status

On December 2, 2002, Plaintiff received notice that on July 14, 2002, her position was changed from Supervisory Telecommunications Specialist, GS-391, to Telecommunications Specialist, GS-391. Testimony revealed that no one from the Spokane sector asked for this change. Instead, the change was made through the personnel division and was due to the number of employees that Plaintiff was supervising. Even if Plaintiff were to establish a casual link between her filing of the EEO complaint and the subsequent reclassification, Defendant has articulated a legitimate nondiscriminatory reason for its decision, and there is no showing of pretext or discriminatory motive.

### (5)    October 2002 disciplinary action

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 22**

1    In September, 2002, Plaintiff was issued a proposed disciplinary action.
2    Although the proposal alleged three charges, only the charge for failure to follow a
3    direct supervisor instruction was sustained.  Plaintiff was suspended for three days.
4    The incident that provided the basis for this charge was the Agent Gomez incident,
5    as discussed *infra*.  This disciplinary action occurred roughly over two years after
6    Plaintiff had filed her first EEO complaint.  There is no causal link between this
7    action and the filing of the EEO complaint.

8    Accordingly, Plaintiff has failed to establish a causal connection between
9    any adverse employment action and her filing her EEO complaints.  There is no
10   evidence in the record that any action taken by Defendant was retaliatory or based
11   on a discriminatory motive.

12   **C.    Sexual Discrimination**

13   In order to prevail in her sexual discrimination claim, Plaintiff must establish
14   a prima facie case of discrimination.  *Vasquez*, 349 F.3d at 638.  To do so, Plaintiff
15   must present evidence with direct or circumstantial evidence of discriminatory
16   intent, or show that she suffered an adverse employment action and other
17   employees with qualifications similar to her own were treated more favorably.
18   *Godwin*, 150 F.3d at 1220.  If Plaintiff succeeds in establishing a prima facie case,
19   she must also show that Defendant's actions were motivated on account of Ron's
20   failure to act or look as a male stereotypically would, or were motivated on account
21   of Tracy's gender.

22   Plaintiff's claims of sexual discrimination can be logically divided into two
23   periods:  from (1) January 1, 2000 to October 2, 2002, the time period when
24   Plaintiff was working as a man and his gender identity conflict was unknown to
25   coworkers or management; and (2) from October 3, 2002 to December 31, 2002,
26   the time period after Plaintiff advised management and coworkers that he was now
27   a woman.  Plaintiff alleges that many instances presented at trial is evidence of
28   sexual discrimination during the January 1, 2000 to October, 2, 2002: (a) Agent

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 23**

Gomez's accusation; (b) disciplinary actions taken by management; (c) Actions taken by Mr. Simer and Mr. McCormick; and (d) Threats by Mr. McCormick. Plaintiff alleges the following instances as evidence of sexual discrimination during the October 3, 2002 to December 31, 2002: (a) Prohibition on speaking about personal issues; (b) Prohibition on wearing a dress; and (c) Prohibition on using women's restroom.

### (1)    January 1, 2000 to October 2, 2002

### (a)    Agent Gomez's Accusations

One of the instances asserted by Plaintiff as evidence of sexual discrimination involved a claim by Border Patrol Agent Gomez that Plaintiff made him uncomfortable in a discussion at an isolated site by talking about personal matters.  Plaintiff was disciplined for this conduct.  The Court is concerned about the lack of memory of the details of the event by Gomez, and the inconsistencies in the dates of the occurrence reflected in his report made to management.  Plaintiff testified that she was with Gomez two weeks earlier than recorded by Gomez, but denied that a personal conversation took place.

In order to conclude that this incident is evidence of a Title VII violation, the Court would have to find that Gomez is lying, that there was a conspiracy to fabricate evidence in order to damage Plaintiff, and the conspiracy included the Deputy Chief, Chief, and perhaps others, as well as Agent Gomez.  The evidence does not support such a conclusion.  The Court heard Plaintiff's admission that she was with Gomez on a date in close proximity with the date recorded by Gomez. Secondly, testimony revealed that on several other occasions, Plaintiff had discussed personal matters with acquaintance coworkers that were unsolicited. Given the Court's opportunity to view the exhibits and listen to the witnesses, the Court does not conclude that Border Patrol management induced Gomez to lie, or that the disciplinary action taken as a result of Agent Gomez's report were on account of Ron's failure to act or look in the way expected of a man.  Accordingly,

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** ~ 24

the response to the Gomez incident, in light of prior warnings to Plaintiff, was not discriminatory or retaliatory.

### (b)    Disciplinary Actions Taken by Management

Plaintiff argues that she received a number of disciplinary actions during this time period that were on account of her appearance. The record demonstrates that Plaintiff received a number of disciplinary actions during the relevant time period. In reviewing the disciplinary actions, it is not the Court's role to determine whether the action should have been taken, whether there was any truth in the allegations, or whether the time-period of the suspensions were appropriate. Instead, the Court needs to conclude that Plaintiff was subjected to these disciplinary actions because of her physical appearance. Plaintiff's evidence did not establish this motivation. All the disciplinary actions were reviewed by various levels of management. In all the memos and emails that were exchanged regarding the disciplinary actions, there is no indication that anyone in management had any discriminatory animus toward Plaintiff on account of her appearance.

The record is void of any direct evidence of discriminatory intent on the part of management, nor has Plaintiff shown that he was treated less favorably than other similarly situated employees during this time period. Likewise, the circumstantial evidence does not support a conclusion that management acted with discriminatory intent because of Plaintiff's appearance. While some of the disciplinary actions appear to be harsh, many were justified by the facts presented to management. Also, many were the result of management's frustration with Plaintiff's lack of supervisory skills and her inability to run an efficient and productive shop. There is nothing in the record, both in the documentation and through the testimony of the employees of the Spokane sector, that anyone in management expressed ill will against Plaintiff on account of his failure to act in the way expected of a man.

### (c)    Actions taken by Mr. Simer and Mr. McCormick

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 25**

Plaintiff maintains that the many memos and complaints made by Mr. Simer and Mr. McCormick were evidence of a hostile workplace environment. If this were true, however, the Court would have to find that Mr. Simer's and Mr. McCormick's motivation for filing their memo and complaints was on account of Plaintiff's appearance, and that management was aware of this motivation. The record does not establish that the motivation was because Ron failed to act in the way expected of a man or that management was so aware. Instead, there were numerous instances where Mr. Simer and Mr. McCormick were frustrated with Plaintiff's management style. Some of these instances were confirmed by management.

### (d)    Threats by Mr. McCormick

Plaintiff testified that in December 2001, Mr. McCormick reported to her that he was staying at the Mossmans' house and, in doing so, implied that he would have access to assault rifles. Plaintiff perceived this statement as a threat, and she and her family left for vacation a day earlier than planned because she feared for her family's safety. Plaintiff also filed a memo regarding Mr. McCormick's statements in which she reported that she had contracted with a security company to patrol her house because she feared for the safety of her family while she was out of town on assignment. Plaintiff's reaction to Mr. McCormick's statement was not reasonable or based in fact. There is nothing to suggest that Mr. McCormick made these statements because Ron failed to act in the way expected of a man.

### (2)    October 3, 2002 to December 31, 2002

Plaintiff claims there were four instances of harassment or discrimination that occurred during this period: (a) management ordering her to not talk about personal issues with other employees; (b) management ordering her to not wear a dress; (c) management prohibiting her from using the women's restroom; (d) the questioning by Mr. Reome. None of these instances constitute direct or circumstantial evidence of discriminatory intent. *See Vasquez*, 349 F.3d at 638.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 26**

Likewise these instances do not establish that other employees with qualifications similar to her own were treated more favorably. *See Godwin*, 150 F.3d at 1220.

### (a)    Prohibition on Speaking about Personal Issues

Some of the employees were uncomfortable with Plaintiff's change from male to female and complained to management. Specifically, some female employees did not feel comfortable being asked about make-up or other grooming issues by Plaintiff, and so informed management. On December 6, 2002, Mr. Foust ordered Plaintiff to refrain from discussing any of her personal matters or issues with agency employees. She was warned that any future communication of this type may result in disciplinary action being taken against her. Plaintiff argues that no other employee was subject to this prohibition, nor had anyone been subject to this type of written order.

As of December, when the warning was given, the coworkers knew only that a person that they knew and had related to as a man was dressing as a woman and had changed his name from Ron to Tracy. The existence of a protocol or possible surgery was not known to them. In this context, it is not surprising that some coworkers were uncomfortable with Plaintiff and preferred not to discuss personal matters with her.[7]

The employer is required to create a workplace that is comfortable for all employees. Within the workplace there are boundaries regarding appropriate and inappropriate conversations. These boundaries are dictated by the relationship between the people who are having the conversation. On one end of the spectrum are people who are good friends who are comfortable discussing intimate details of each other's life. On the other end, co-employees may be mere acquaintances. Social rules dictate that, generally, it is not appropriate to discuss intimate details

---

[7]As is evident from the Plaintiff's latter success in the same workplace, the level of comfort increased with information, exposure, and time.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 27**

of one's life with acquaintances or people who are not close friends.  Testimony revealed that Plaintiff had difficulty in understanding and respecting these boundaries.  There was testimony that Plaintiff would discuss his appearance, including his breast size, with people he had only recently met.  Coworkers testified that they were uncomfortable talking about make-up with Plaintiff.  There was no testimony presented that other employees had similar problems, or that other employees were discussing their breast size, or other body attributes that are distinctly sexual.  Thus, to the extent that Plaintiff was issued a written directive that was not given to other similarly situated employees, it was because Plaintiff needed direction and assistance in understanding appropriate workplace boundaries.  Management's failure to address complaints about employee discomfort with discussions of personal matters could have been criticized as failure to stop unwelcome conduct.  Thus, management ordering Plaintiff to refrain from speaking about personal issues did not create a hostile workplace environment, nor did it rise to the level of sexual discrimination or retaliation.

### (b)    Prohibition on Wearing a Dress

Shortly after making the transition, Plaintiff showed up at work in a dress.  Some of the employees complained that the dress was inappropriate.  Mr. Foust ordered Plaintiff not to wear dresses to work.  He considered it inappropriate and unsafe, given the job performed by Plaintiff.

Title VII does not apply to grooming and dress standards, unless the standards impose unequal burdens on one sex.  *Jespersen v. Harrah's Operating Co., Inc.*, 392 F.3d 1076, 1079 (9th Cir. 2004).  In *Jespersen,* the female bartenders were required to wear makeup and wear their hair "teased, curled, or styled" each day.  *Id.*  The male bartenders were prohibited from wearing makeup and were only required to maintain short haircuts.  *Id.*  The circuit held that employers may adopt different gender-differentiated dress and grooming requirements, but the standards could not impose a greater burden on one sex than the other.  *Id.* at 1080.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 28**

Plaintiff's discrimination claim based on gender-differentiated dress requirements could be viewed from two different perspectives: (1) women in the shop were being treated differently because they could not wear dresses in the shop; or (2) men were being treated differently because the women in the administrative office could wear dresses, but the men in the shop could not.[8] Either one fails because the prohibition on wearing dresses did not impose a greater burden on one sex than the other.

### (c)    Prohibition on Using Women's Restroom

Shortly after making her transition, Plaintiff was advised that she could not use the women's restroom.  She agreed that she would use a third "unisex" bathroom.  However, she was offended when she was told that she could not use the women's restroom in other Border Patrol locations.  When she was at a location where there was no unisex bathroom available, management required Plaintiff to use the men's restroom.  This was offensive to Plaintiff and she refused to do so.  When Plaintiff was in the outlying stations, she would use the restroom at a nearby gas station.

The Court is unaware of any requirement imposed on an employer to permit a person in Plaintiff's situation to use the women's restroom.  Perhaps, in the future, the law may impose on an employer an obligation to comply with medical directions for an employee who is going through a gender change.  However, at this time, there is no such obligation. Moreover, the management had no notice of the protocol in the period in question, and the direction to use the men's restroom in other locations was not discriminatory.

---

[8]Management's orders not to wear a dress to work coincided with Plaintiff's decision to participate in society as a woman.  At that time, however, Plaintiff had not made the decision to undergo sexual reassignment surgery.  Thus, at that time, she was psychologically and mentally a female, yet biologically, she was a male.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 29**

1

**CONCLUSION**

2      The Court is sure that Plaintiff felt isolated and unfairly treated at the Border

3   Patrol.  Part of this feeling was caused by the difficulty her coworkers had in

4   dealing with the manifestations of Plaintiff's gender conflict.  Nevertheless, the

5   evidence does not show that this confusion caused the Border Patrol, or her

6   coworkers, to discriminate against her because she failed to conform to a sex

7   stereotype.  Instead, action taken by her employer and her coworkers were on

8   account of legitimate workplace concerns, including supervisory deficiencies and

9   inappropriate conversations.

10      The Court is sympathetic to Plaintiff's situation and is understanding of the

11   emotional toil workplace conflict can cause in a person's life.  It is heartened by

12   the fact that it appears that the workplace environment at United States Customs

13   and Border Protection has improved for her, and currently things are going well for

14   Plaintiff at her job.  During the period in question, there is no doubt that working at

15   United States Customs and Border Protection was very difficult for Plaintiff.

16   However, Title VII requires more than a difficult workplace.  To be successful in

17   establishing a claim under Title VII, Plaintiff carries the burden of establishing

18   discriminatory motive on the part of United States Customs and Border Protection.

19   In this case, the record does not support a finding for Plaintiff that United States

20   Customs and Border Protection violated Title VII.  Therefore, Plaintiff's Title VII

21   claims fail.

22      Accordingly, for the forgoing reasons, it is **HEREBY ORDERED**:

23      1.  Plaintiff's claims are **dismissed** and judgment is granted in favor of

24   Defendant.

25      2.  The District Court Executive shall enter judgment in favor of the

26   Defendant.

27   //

28   //

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** ~ 30

**IT IS SO ORDERED.** The District Court Executive is hereby directed to enter this order and to furnish copies to counsel and close the file.

**DATED** this 23rd day of June, 2005.

s/  ROBERT H. WHALEY
United States District Judge

Q:\CIVIL\2003\Sturchio\ffandcl3.wpd

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 31**